```
         IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION
```

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>**HIMER ALBERTO ELISEA,**<br><br>　　　　　　Defendant. | **Case No. 17 CR 730**<br><br>Judge Harry D. Leinenweber |

### MEMORANDUM OPINION AND ORDER

The Government brings a Motion for Judgment of Default on Bond (Dkt. No. 60), requesting the Court enter a default judgment in the amount of $50,000 against corporate surety Foster Bail Bonds. For the following reasons, the Court denies the Government's Motion.

### I. BACKGROUND

In December of 2017, a grand jury in the Northern District of Illinois indicted Himer Elisea ("Elisea") for possession with intent to distribute and distribution of one kilogram of heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846. (Indictment, Dkt. No. 10.) Elisea, who resided in Georgia, was arrested, arraigned, and released subject to conditions. The conditions of his pretrial release included: a 9:00 p.m. to 6:00 a.m. curfew; not to travel outside the Northern District of Georgia; and GPS monitoring.

(Order Setting Conditions of Release, Ex. B to Mot. for J. of Default on Bond, Dkt. No. 60-2.) Foster Bail Bonds ("Foster"), a corporate surety located in Georgia, secured Elisea's $50,000 bond. (Appearance Bond, Ex. A to Mot. for Default, Dkt. No. 60-1).

On two occasions, Elisea sought to modify the conditions of his pretrial release. He first requested leave to travel to Destin, Florida from May 25, 2018, through May 28, 2018, purportedly for a work training conference. (Mot. to Modify Conditions of Release, Dkt. No. 33.) Elisea provided a letter from his employer, Catalina Rojas of P&C Construction Group, to support this request. (Rojas Letter, Ex. A to Mot. to Modify, Dkt. No. 33-1.) His second request was to modify his curfew. Elisea's motion erroneously stated that the curfew was 7:00 p.m. to 7:00 a.m. and asked that the curfew be lifted so that he could work longer hours when required by his employer. (Motion to Modify, Dkt. No. 40). The Court granted both requests.

The Court set Elisea's trial date for February 4, 2019. (Minute Entry, Dkt. No. 43.) Just before trial, Elisea cut his ankle bracelet and fled. Judge Lee signed a January 25, 2019, emergency order to revoke Elisea's bond and issued a bench warrant for his arrest. (Order and Bench Warrant, Dkt. Nos. 52, 53.) On February 14, the Government filed a motion for a default judgment on Elisea's bond. On February 15, the Government attempted to

notify Foster of this motion through an overnight FedEx shipment. (FedEx label, Ex. A to Govt.'s Resp., Dkt. No. 68-1.) Foster had changed addresses, however, and the shipment was returned. (*Id.*) Foster did not receive actual notice of Elisea's flight and of the Government's intention to hold Foster liable for the bond until April 24, when the Government filed its current Motion. Elisea remains a fugitive.

The Government now brings this Motion for Judgement of Default on Bond against Foster in the amount of the surety, $50,000.

## II.  DISCUSSION

### A.  Legal Standard

A court must order bond forfeiture if the defendant breaches a bail condition but may also set the forfeiture aside in whole or in part if either "the surety later surrenders into custody the person released on the surety's appearance bond" or "it appears that justice does not require bail forfeiture." FED. R. CRIM. P. 46(f)(1)-(2). Setting aside the forfeiture in most cases is inappropriate because it would undercut the purpose of bail bonds, which is to insure the presence of the accused at court. *See United States v. Gutierrez*, 771 F.2d 1001, 1004 (7th Cir. 1985). Accordingly, the Court must usually require forfeiture when the defendant absconds and remains at large, and only set aside forfeiture in rare circumstances. Elisea remains at large, and Foster claims that its investigation indicated that he is in

- 3 -

Mexico; it seems unlikely that Foster will be able to apprehend Elisea and surrender him to the authorities. Thus, Foster argues that it should avoid forfeiture because justice so requires.

The Seventh Circuit provides a six-factor test to guide courts when determining whether to set aside a bond forfeiture. The factors are: "(1) the willfulness of the defendant's breach of conditions; (2) the participation of the sureties in apprehending the defendant; (3) the cost, inconvenience and prejudice suffered by the government as a result of the defendant's breach; (4) any explanation or mitigating factors presented by the defendant;" (5) whether the surety is a professional bondsman or one of defendant's friends or family members; and (6) the appropriateness of the amount of the bond. *Gutierrez*, 771 F.2d at 1003-04 (internal citations omitted). This test seems to presuppose a breach of a lesser bond condition—for example, a defendant who used alcohol but wasn't supposed to. But this test does not work very well when the defendant violates the ultimate condition, which is to be present for trial. When a defendant flees on the eve of trial, the Government is obviously greatly prejudiced, and the defendant's action was obviously willful. A defendant who is a fugitive will not willingly appear in court to present an explanation or mitigating factors. In that sort of case, the *Gutierrez* test is not as relevant. Recognizing this, the Seventh Circuit noted that in some cases it is acceptable not to consult these factors. *See*

*United States v. Torres*, 807 F.3d 257, 265 (7th Cir. 2015) ("not unreasonable" where defendant fled after ordered to surrender not to use the *Gutierrez* test because the factors did not "easily align"). However, other Seventh Circuit precedent can guide the Court in deciding the outcome.

A surety agreement is a contract, and a change in the terms of release that increases the risk the surety agreed to entitles the surety to revoke its commitment. *United States v. King*, 349 F.3d 964, 966 (7th Cir. 2003). Because of this, "a surety should be informed of any judicial proceedings that potentially affect his or her interests." *Torres*, 807 at 265. A court may discharge a surety's obligations if the surety is uninformed of a material change to the terms of a defendant's release and is unable to object. *King*, 349 F.3d at 966–67.

A material change is one that "significantly augments the risk that the defendant will not appear when required." *King*, 349 F.3d at 967. If a material increase in risk occurs to which the surety is unable to object and "the incremental risk [comes] to pass" by the defendant fleeing, the surety can be relieved of its obligation. *Id.* In *United States v. King*, 349 F.3d 964 (7th Cir. 2003), the Seventh Circuit provided an example analogous to the situation here, concerning a hypothetical defendant authorized to travel to a conference in New Orleans. The Seventh Circuit found that this travel allowance was a material increase in risk, and:

> if he had failed to return to Illinois, the realization of that risk would have made it inappropriate to collect from the sureties. Now suppose, however, that [the defendant] *did* return and was again required to remain home with electronic monitoring. If he sawed off the ankle bracelet and bolted for parts unknown, the sureties would remain liable—for *that* form of flight would have been exactly the risk they took. The authorized trip would not have played a role.

*King*, F.3d at 967. The Court must determine whether the present situation is distinguishable. The above hypothetical's basic lesson is that (assuming the surety has no opportunity to object) if a defendant goes on the trip and does not come back, the surety is exonerated, and if the defendant returns from the trip and then later takes flight, the surety is liable. But the hypothetical assumes that the trip did not "play a role" in the defendant's flight, and here Foster presents a wrinkle. Foster argues that Elisea's requests to travel and remove his curfew were pretextual, that he requested the pretrial release modifications in bad faith and that it is likely that he used these modifications as cover to prepare to flee. Because of that, Foster argues, Elisea's situation is different from the hypothetical and from the *King* case because Elisea's pretrial release modifications did play a role in his flight.

### B. The Conference

The Government argues that Elisea's trip to Florida did not play a role in his flight because Elisea went on the trip and

returned without incident. Foster counters that its investigation turned up strong evidence that the trip was a ruse. First, when requesting that the surety post bond for him in November 2017, Elisea indicated he had worked for a roofing company, A&F Roofing, for five years. But in May 2018, when Elisea requested leave to travel to Florida for a work conference, his purported employer, P&C Construction, stated in a letter that Elisea had worked for P&C for the past year. P&C's letter also promised a certificate of attendance regarding Elisea's participation in the conference but never provided one; the letter also provided no itinerary or any other information about the conference. Moreover, Foster investigated Rojas, P&C's owner and the person who wrote the letter and found that Rojas' last name was actually Rojas-Rodriguez and that she had omitted the second part of her last name from her signature on the letter. Elisea's girlfriend's last name is Rodriguez, and Foster believes there may be a familial relationship between the two. Foster also discovered that Elisea's girlfriend had an apartment in Florida and that P&C's registered address was a residential home. One of Foster's investigators interviewed Rojas, who said that the purpose of Elisea's Florida trip was not for a conference or training, but to look for work. While not ironclad evidence that Elisea used the Florida trip to prepare to flee, it is enough to convince the Court that Elisea was dishonest in requesting leave to travel. Further, such dishonesty is

indicative of a possible intent to use the trip to plan Elisea's flight.

### C. Curfew

Foster argues that lifting the curfew was also pretextual and that Elisea wanted the curfew lifted so that he could make preparations to flee. To support this, Foster points to Elisea's request to have the curfew lifted, in which he erroneously states that his curfew is from 7:00 p.m. to 7:00 a.m. The Government argues that the time when Elisea tampered with his ankle bracelet, 7:47 p.m., was within his original 9 p.m. to 6 a.m. curfew and that, as a result, lifting the curfew played no role in his flight. Foster responds that 7:47 p.m. was within the time Elisea believed he had previously been on curfew, and that fact is significant. These arguments are both difficult to follow and unconvincing. Neither party presented a good explanation for why it would make a difference at what hour of the day Elisea chose to cut and run. Moreover, Foster presented no evidence that Elisea spent time he normally would have spent on curfew instead preparing to flee. Foster has asked for limited discovery on the matter—specifically, Elisea's GPS data—so that it can investigate further but, as the Court will explain below, that information is not needed.

### D. Notice

In addition to not receiving notice of Elisea's requests to modify his pretrial release conditions, Foster did not receive

actual notice that Elisea absconded until April, about four months after he fled. The surety must be notified of proceedings affecting its rights, and if the defendant fails to notify the surety, "the prosecutor should do so; and if both sides fail to protect the sureties' entitlement, then the judge should ensure that notice is given." *King*, 349 F.3d at 966. The Government did attempt to notify Foster via FedEx that Elisea fled, but not until three weeks after the fact. That is a long time to wait, but even had Foster discovered the problem at that time it might have had a better shot at apprehending Elisea. When the Government's FedEx overnight package was returned, it made no further attempt to contact Foster. The Federal Rules of Civil Procedure regarding notice, which are applicable in a bond proceeding case, require more. *Cf. Torres*, 807 F.3d at 262 (bond proceeding is "collateral to the criminal case and civil in nature"). Rule 5(b) allows service by "mailing it to the person's last known address." FED. R. CIV. P. 5(b)(2)(C). Many courts, however, have found that FedEx does not constitute "mail" when the recipient does not actually receive the package. *See Audio Enters., Inc. v. B&W Loudspeakers*, 957 F.2d 406, 409 (7th Cir. 1992) ("Federal Express is not first class mail."); *Prince v. Poulos*, 876 F.2d 30, 34 n. 1 (5th Cir. 1989) ("Since Federal Express is not a public authority, they are not a form of 'mail.'"). Foster set up mail forwarding with the United States Postal Service, and if notice had been sent that way Foster would

have received it. The Government complains that it is "not required to send out a search party for a surety who has no apparent interest in remaining informed about the proceedings underway." (Gov.'s Resp. at 8.) True enough, but they might have at least tried calling — Foster's phone number was listed on the bond and did not change when Foster moved.

The lack of timely notice after Elisea fled prejudiced Foster. One of Foster's investigators averred that the longer a suspect is on the run, the more difficult it is for the surety to apprehend him. Four months is a long time. The Government, and certainly the Court, would have preferred that Foster apprehend Elisea and thereby avoid forfeiture. But that route was effectively foreclosed by delay, and now Foster can only argue that it should avoid forfeiture because justice requires it. That is a difficult position to be in, and one it might have avoided had it been properly notified.

No factor taken alone would have convinced the Court that the bail forfeiture should be set aside but viewed as a whole, justice requires Foster be excused from liability. Foster argues that if it had been given notice that Elisea sought to modify the conditions of his release, it would have objected and sought full security of the bond. Lack of timely notice forces us to take Foster at its word. *See King*, 349 F.3d at 967. Foster has demonstrated that Elisea requested modifications of his release

terms in bad faith. If Foster could uncover this much evidence four months after the fact, it seems likely to the Court that Foster might have conducted an even more thorough investigation had it had time to make its objections contemporaneously. Further, Foster was not timely notified of changes in Elisea's status, and this greatly inhibited its investigation and its efforts to apprehend Elisea. Put together, this convinces the Court that justice requires that Foster's bond forfeiture should be set aside.

### III.  CONCLUSION

For the reasons stated herein, the Government's Motion for Judgment of Default on Bond (Dkt. No. 60) is denied.

**IT IS SO ORDERED.**

                                                                Harry D. Leinenweber, Judge
                                                                United States District Court

Dated: 12/10/2019